## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **LIFEHEALTH SCIENCE, LLC** | ) | |
| 1375 E. 9th Street | ) | |
| One Cleveland Center, Suite 2800 | ) | CASE NO. |
| Cleveland, Ohio 44114 | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| -vs.- | ) | |
| | ) | |
| **DR. NIKOLAOS TSIRIKOS-KARAPANOS** | ) | |
| 1964 E. 85th Street | ) | |
| Cleveland, Ohio 44106, | ) | |
| | ) | |
| **METRON NUTRACEUTICALS, LLC** | ) | |
| c/o Clayton R. Thomas | ) | |
| 5016 Fairwood Blvd NE #238 | ) | |
| Tacoma, Washington 98422, | ) | |
| | ) | |
| **METRON NUTRACEUTICALS, LLC** | ) | |
| c/o Jim Petropouleas, Statutory Agent | ) | |
| 7912 Broadview Road | ) | |
| Broadview Heights, Ohio 44147, | ) | |
| | ) | |
| **CLAYTON THOMAS** | ) | |
| 5016 Fairwood Blvd. N.E. #238 | ) | |
| Tacoma, Washington 98422, | ) | |
| | ) | |
| Defendants. | ) | |

---

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION, AND MONEY DAMAGES

---

Plaintiff LifeHealth Science, LLC ("*LHS*") for its complaint against Defendants

Clayton Thomas, Dr. Nikolaos Tsirikos-Karapanos, Metron Nutraceuticals, LLC

(Washington) and Metron Nutraceuticals, LLC (Ohio) (collectively, the "*Defendants*")

states as follows:

## INTRODUCTION

1.     LHS brings this action because an individual who performed work for LHS along with one of its independent sales representatives, has misappropriated LHS's confidential and proprietary information, including LHS's revolutionary formula for the dietary supplements ZNatural also known as CF5 ("**CF5**") and ZC, also known as CCF5 ("**CCF5**"). These individuals, Dr. Nikolaos Tsirikos-Karapanos and Clayton Thomas, have colluded to form limited liability companies, file provisional patents on LHS's products, and are currently using LHS's proprietary and secret formulas, products, and manufacturing knowledge to usurp LHS's business opportunities and to market and sell products.

## THE PARTIES

2.     LHS is an Ohio limited liability company with a principal place of business in Cuyahoga County, Ohio.

3.     Clayton Thomas ("**Mr. Thomas**") is an individual residing in the State of Washington who regularly conducts business in Cuyahoga County, Ohio. Mr. Thomas has served as an independent sales representative of LHS.

4.     Dr. Nikolaos Tsirikos-Karapanos ("**Dr. Karapanos**") is an individual residing in Cuyahoga County, Ohio. From October 2013 until October 2014, Dr. Karapanos was LHS's Chief Scientist and Medical Director.

5.     Metron Nutraceuticals, LLC ("**Metron**") is a Washington limited liability company that was formed on September 9, 2014 by Mr. Thomas, who is also its

statutory agent. Upon information and belief, Metron is using LHS information and performs and is planning to perform business in Cuyahoga County.

6.     Metron Nutraceuticals, LLC ("***Metron II***") is an Ohio limited liability company that was formed on October 9, 2014, with a principal place of business located in Cuyahoga County, Ohio. Dr. Karapanos is listed as a member of Metron in its filings with the Ohio Secretary of State.

## JURISDICTION AND VENUE

7.     This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 1 – 376, the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2002, the Lanham Act, 15 U.S.C. §§ 1051 – 1141n, and pendent Ohio statutory and common law. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338, 1367, and 2201(a).

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## BACKGROUND FACTS

**A.     LHS Owns the Rights to CF5 and CCF5–Dietary Supplements and all Products Derived from these LHS Products**

9.     LHS is a business in the dietary supplement and health industry and owns the formula to CF5 and CCF5, which it markets under the names "ZNatural" and "ZC."

10.     CF5 is a product manufactured from a form of Zeolite known as a clinoptilolite. It aids the body's natural processes for removing heavy metals and other toxins from the body and supports the body's natural health and vitality. CCF5 is a compound product of Vitamin C and CF5 that provides additional health benefits to its users (together, the "***Products***").

11.     The creation and manufacturing of the Products took many years and significant resources and testing to complete.

12.     Throughout its existence, LHS has spent valuable time and resources working to formulate, refine, test and manufacture the Products.

13.     In July, 2013, LHS contracted with a company, VTEC Laboratories Inc., to create a new formula for a product that had been marketed under the trademark, "ZNatural" along with procedures by which ZNatural would be manufactured. LHS was seeking a product that was effective and stable.

14.     Pursuant to its agreement with VTEC, VTEC developed CF5 for LHS, which product continues to be marketed as "ZNatural."

15.     On September 3, 2013, VTEC provided CF5 to LHS, including the product's manufacturing procedures.

16.     After LHS received the new product from VTEC, LHS's former Chief Executive Officer, Kent Adams ("***Mr. Adams***"), worked with VTEC to refine both of the Products.

17.     LHS determined that it needed a dedicated individual to further refine the formulas, institute good manufacturing practices consistent with U.S. Food and Drug Administration rules and regulations ("***GMP***") and scale up production, so that the Products would be ready for market.

**B.      Dr. Karapanos is Hired to Provide Technical Services to LHS**

18.     As an accommodation to Dr. Karapanos, on or about October 1, 2013, non-party MEI Hotels, Inc., which has a common owner/member with LHS, hired Dr. Karapanos.

19.     LHS did not offer medical benefits to its employees.

20.     As part of the accommodation to Dr. Karapanos, MEI Hotels, Inc. agreed to hire Dr. Karapanos in order to provide Dr. Karapanos with medical benefits for him and his family.

21.     MEI Hotels, Inc. agreed to provide consulting services to LHS and assigned its employee, Dr. Karapanos, to actually provide those services to LHS. A copy of the agreement that memorializes this decision is attached as Exhibit 1.

22.     From his hiring until his termination, Dr. Karapanos functioned as LHS's Chief Scientist and Medical Director. As LHS's Chief Scientist and Medical Director, Dr. Karapanos was responsible for, among other things: (i) refining and further developing the Products; (ii) running LHS's lab; (iii) producing and optimizing the production method for the Products; (iii) ensuring that LHS complied with GMP for the manufacturing of the Products; and (iv) manufacturing the Products.

23.     To assist him in the performance of his duties in that assignment, LHS purchased an Apple MacBook Pro for Dr. Karapanos, which Dr. Karapanos used throughout the time he was assigned to perform services for LHS and has not returned to LHS.

24.     Dr. Karapanos based his work on LHS's products and intellectual property. Prior to his work with LHS, Dr. Karapanos had no experience with zeolites of zeolite-derived products. The formulations that Dr. Karapanos worked with were provided to him in writing by LHS and any and all of the work he performed was derivative from the materials that LHS' employees or its agents, including VTEC, provided.

25.     Information concerning the Products, including the manufacturing processes for the Products, was kept under lock and key inside the offices of LHS. Specifically, all of these materials were stored in a locked cabinet at Dr. Karapanos's desk in LHS's lab, which is part of a secure facility.

26.     The work Dr. Karapanos did for LHS was kept secret and otherwise protected, other than from employees or agents of LHS with a need to know.

27.     In connection with Dr. Karapanos's assignment as LHS's Chief Scientist and Medical Director, LHS followed its general practice and provided Dr. Karapanos with a Mutual Confidentiality and Nondisclosure Agreement. This agreement generally provided that the formulas for LHS products are LHS's confidential information and that employees and agents are required to maintain LHS's confidence.

28.     As a matter of course, LHS had its employees, agents, potential businesses, and sales representative sign confidentiality and non-disclosure agreements.

29.     The agreement given to Dr. Karapanos specifically stated that he could not use the information gained during his employment at LHS to compete with LHS, and that disclosure of the formula to Dr. Karapanos did not create any right, title or interest in the formulas as produced in Dr. Karapanos.

30.     Despite being reminded of his obligations to LHS and numerous requests to have him return the Mutual Confidentiality and Nondisclosure Agreement, and despite the fact that he continued to provides services to LHS and use LHS's confidential information, Dr. Karapanos failed to execute and return this agreement to LHS.

31.     LHS continued to maintain the confidentiality of this information, including the work assigned to Dr. Karapanos.

32.     LHS did not grant Dr. Karapanos any rights to any LHS intellectual property, including any formulas or manufacturing processes.  Specifically, LHS never granted Dr. Karapanos any rights to any formulas, manufacturing processes or anything else related in any way, to the Products or any related product.

33.     MEI Hotels, Inc. also did not have the authority nor did it grant Dr. Karapanos any rights to any LHS intellectual property, including, any formulas or manufacturing processes.

34.     Indeed, at all times, LHS made clear to Dr. Karapanos that he was working on developing products for LHS and that these products and all intellectual property relating to these products remained the property of LHS.

35.     Throughout his tenure as LHS's Chief Scientist and Medical Director, Dr. Karapanos utilized LHS's forms, including production formula forms, which clearly identified that the information obtained and recorded on the forms was confidential, for internal LHS use only, and that LHS owned the information.

36.     Mr. Adams directed Dr. Karapanos to prepare three provisional patents related to the Products.

37.     Because an entity cannot be listed as an inventor on a patent, LHS instructed Dr. Karapanos to list himself as the inventor and to list LHS as the assignee of the patent.

38.     As the assignee, LHS would own the patent.

39.     However, Dr. Karapanos failed to prepare the provisional patents as instructed. Instead, Mr. Adams, LHS's former CEO, was forced to prepare an initial draft that Dr. Karapanos, who had the scientific background and intimate familiarity with the product, could review and revise as appropriate.

40.     Despite being provided drafts of the patent applications, Dr. Karapanos did not revise any patent drafts so that LHS could obtain the patents.

**C.     Mr. Thomas was a Salesman for LHS**

41.     In addition to employing scientists to develop the Products, LHS has ongoing relationships with persons who market, or are marketing, its products, including the Products.

42.     Mr. Thomas is one of these persons and has been an independent sales representative, selling ZNatural and other LHS products since at least 2012.

43.     Mr. Thomas signed a "Sales Representation Agreement" with LHS (the "***Sales Agreement***"). A true and accurate copy of the Sales Agreement is attached as Exhibit 2.

44.     In the Sales Agreement Mr. Thomas expressly acknowledged and agreed that he had no ownership or rights to the Products and agreed to hold LHS's trade secrets and confidential and proprietary information in the strictest of confidence.

45.     Specifically, the Sales Agreement provides:

Representative [Mr. Thomas] recognizes and acknowledges that confidential information, including, without limitation, information, knowledge or data (i) of a technical nature such as but not limited to methods, know how, formulae, compositions, processes, discoveries, machines, inventions, products, product specifications, computer programs and similar items or research projects: (ii) of a business nature such as but not limited to information about cost, purchasing, pricing, profits, market, sales or customers, including lists of customers and the

financial condition of LifeHealth Science [LHS]: (iii) pertaining to future developments such as but not limited to research and development or future marketing or merchandising, and trade secrets of LifeHealth Science: and (iv) all other matters which LifeHealth Science treats as confidential (the items described above being referred to collectively hereinafter as "Confidential Information"), are valuable, special and unique assets of LifeHealth Science. Representative shall keep secret and retain in strictest confidence, and shall not use for the benefit of himself or others, except in connection with the business and affairs of LifeHealth Science, and any and all Confidential Information learned by Representative before or after the date of this Agreement, and Representative shall not, without the express written consent of LifeHealth Science or as required by law, disclose such Confidential Information to anyone outside of LifeHealth Science either during or after the termination of this Agreement.

Representative shall take all reasonable and necessary steps to guard against the unauthorized dissemination of the Confidential Information.

Representative acknowledges and agrees that LifeHealth Science is the sole and exclusive owner of the Products and the Confidential Information, and Representative has absolutely no proprietary or ownership rights or other interests whatsoever in any of the foregoing.

46.    Further, Mr. Thomas executed a Mutual Confidentiality and Nondisclosure Agreement, memorializing and confirming his ongoing obligation to preserve and keep LHS's confidential and proprietary information secret (the "***Thomas NDA***"). A true and accurate copy of the Thomas NDA is attached as Exhibit 3.

47.    The Thomas NDA defines "Confidential Information" as

any product specifications and data, marketing and sales data, lists of actual and prospective customers, customer requirements, price lists, product lists, market studies, financial statements, projections and budgets, business plans, the names and backgrounds of key personnel, photographs, graphs, drawings, samples, research and development, manufacturing or distribution methods, processes, improvements, devices, know-how, inventions (whether patentable or not), discoveries, concepts, ideas, designs, methods and information, facts, opinions, conclusions, labels, products, formulae, uses, analysis, information, reports, records, business relationships, research, trade secrets or know-how (relating to any research project or otherwise), work in progress, future development, engineering, manufacturing, financial or personnel matters relating to a Disclosing Party, its present or future products, technology, sales,

customers, members, employees, affiliates, investors, prospects, markets or business, whether communicated orally, electronically or in writing or obtained by a Receiving Party through observation or examination of the Disclosing Party's facilities, samples or procedures.

48.     Under the Thomas NDA, Mr. Thomas is required to "hold any Confidential Information in the strictest confidence" and is "prohibited from directly or indirectly disclos[ing] any Confidential Information to any person or entity whatsoever, except as provided in this Agreement, absent the prior express written instruction, signed by the president or chief executive officer" of LHS. Exh. 3 at ¶ 4.

49.     Mr. Thomas specifically acknowledged that LHS's confidential information "is valuable business information which could be unfairly used to interfere or compete with" LHS and its business operations and specifically agreed he would not use such information to interfere or compete with LHS. Exh. 3 at ¶ 4.

50.     Mr. Thomas signed the NDA and remains bound by its terms.

**E.     LHS Travels to Florida to Meet with Jeunesse and Develop the Business Relationship.**

51.     In connection with Mr. Thomas's position as an independent sales representative for the Products, Mr. Thomas introduced LHS to Jeunesse Global ("***Jeunesse***"), a multi-level marketing company specializing in skin care and dietary supplements, as a possible distributor for LHS.

52.     Jeunesse and LHS were mutually interested in reaching a distribution agreement for the sale and marketing of the Products.

53.     On or about August 28, 2014, representatives of LHS, including LHS's Chairman, Mr. Thomas and Dr. Karapanos, traveled to Florida to present the Products to Jeunesse.

54.     Mr. Thomas, after he had executed the Thomas NDA, and Dr. Karapanos travelled to Florida to meet with Jeunesse in their respective capacities as a sales representative and Chief Scientist/Medical Director of LHS.

55.     Prior to providing any confidential or proprietary information at the meeting, LHS presented Jeunesse with a Non-Disclosure Agreement, which Jeunesse executed (the "***Jeunesse NDA***"). LHS required Jeunesse to execute the Jeunesse NDA to protect LHS's confidential information and trade secrets relating to the Products.

56.     At the meeting, Jeunesse gave its executed NDA to LHS's Chairman, who because he was not carrying a brief case requested that Dr. Karapanos hold the document to return to the Chairman after the meeting. Despite being requested to return the NDA, to date, Dr. Karapanos still possesses the Jeunesse NDA. A copy of correspondence between LHS and Dr. Karapanos regarding the requested turnover of the Jeunesse NDA is attached as Exhibit 4.

57.     During the August meeting, Jeunesse expressed significant interest in marketing and selling the Products.

58.     Following the meeting, LHS prepared to increase its production and continue refining its formulation of the Products in anticipation of an agreement being reached with Jeunesse.

**F.     Demand for Formation of New Company and Ownership Stake**

59.     On or about September 5, 2014, one week after the meeting with Jeunesse, Mr. Thomas demanded that he and Dr. Karapanos be given an ownership interest in a new company that would be dedicated to selling the Products to Jeunesse. A copy of the e-mail evidencing this demand is attached as Exhibit 5.

60.     In response, LHS specifically stated that Mr. Thomas had no ownership rights to the Products or the business opportunity with Jeunesse because it was developed while Mr. Thomas was LHS's independent sales representative. LHS reminded Mr. Thomas that he was being paid a 10% commission pursuant to his sales agreement when he found Jeunesse and brought the opportunity to LHS. *See* Exh. 5.

61.     LHS also reminded Mr. Thomas that Dr. Karapanos was working for LHS and that if he was given such a large (33%) ownership interest in the company, LHS's other investors would question why he was being compensated in "such an unusual and lucrative manner." *Id.*

62.     LHS made it clear that the Products belonged to LHS and that no discussions concerning compensation could be had until the agreement with Jeunesse was finalized.

**G.     Theft of the Products, Filing of Provisional Patents and Creation of Metron.**

63.     Upon information and belief, at some point it became clear to Mr. Thomas that LHS would not agree to his extraordinary proposal for participation in the profits from doing business with Jeunesse. Dr. Karapanos, on the other hand rejected, on at least two occasions, having a discussion as to his future compensation and potential participation in ownership. Instead, he made a decision to collude with Mr. Thomas to misappropriate the proprietary and secret formulas for the Products and manufacturing processes.

64.     Accordingly, Mr. Thomas and Dr. Karapanos engaged in a series of activities designed to allow them to misappropriate the Products and begin their own competitive business to sell these products.

65.     Dr. Karapanos stopped appearing for work, asserting that he had become seriously ill and could not perform work for LHS.

66.     Upon information and belief, despite being too ill to perform work for LHS, Dr. Karapanos was healthy enough to perhaps edit, complete and submit, or have submitted and perhaps edit one or more of the LHS originally-authored provisional patent applications as his own product.

67.     Also during this time, Dr. Karapanos came to the LHS lab and manufacturing facility to prepare 200 bottles of CF5 for Jeunesse for Mr. Thomas to take to Macau to present to Jeunesse distributors.

68.     These 200 bottles, upon instruction from Mr. Thomas, were not billed to Jeunesse.

69.     According to Dr. Karapanos's counsel, Dr. Karapanos has now filed one or more of these LHS-drafted provisional patents with the United States Patent and Trademark Office.

70.     While Dr. Karapanos was taking time off for medical reasons from LHS and filing these provisional patents, he was still being paid by LHS through its agreement with MEI Hotels, Inc.

71.     Dr. Karapanos stopped performing his duties as LHS's Chief Scientist and Medical Director, and removed from LHS's facilities all files, both hard copy and electronic, that concern the Products and their respective manufacturing processes. Dr. Karapanos also took a textbook on good manufacturing practices and a composition notebook containing LHS's trade secrets.

72.     Dr. Karapanos also took the Apple laptop computer that LHS had supplied to him so that he could work remotely when needed. Despite repeated demand, Dr. Karapanos has refused to return LHS's laptop, which was purchased by LHS and contains LHS's trade secrets and confidential and proprietary information.

73.     Dr. Karapanos began asserting that he was the owner of the Products, or products derived therefrom and that no one could manufacture them but him.

74.     Dr. Karapanos has made these claims despite: (i) clear directives from LHS; (ii) internal LHS documents expressly stating that the formula to the Products belonged to LHS; and (iii) Dr. Karapanos's prior understandings and representations throughout the course of his employment that the Products belonged to LHS.

75.     In addition to Dr. Karapanos's activities, Mr. Thomas has been actively marketing and attempting to sell the Products or derivatives thereof as his and Dr. Karapanos's own product.

76.     Upon information and belief, in September, Mr. Thomas participated in a telephone conference with Jeunesse wherein he touted the sale of the Products or derivatives thereof as "new" products that he and Dr. Karapanos, who Mr. Thomas referred to as his "partner," had developed.

77.     Upon information and belief, Mr. Thomas has traveled to Florida numerous times in the last two months to continue discussions with Jeunesse about these products.

78.     LHS learned that Mr. Thomas had formed Metron on September 15, 2014.

79.     Upon information and belief, the purpose of Metron is to sell the Products and other related products to Jeunesse, among other companies.

80.     Accordingly, on October 8, 2014, as a result of Dr. Karapanos's conduct, including stealing LHS's trade secrets, MEI Hotels, Inc. terminated Dr. Karapanos's employment and he ceased being the Chief Scientist and Medical Director for LHS. A copy of the termination letter sent to Dr. Karapanos is attached as Exhibit 6.

81.     Also on October 8, 2014, LHS sent a cease and desist demand to Mr. Thomas, demanding that he immediately stop marketing LHS's products.

82.     Despite these requests, Dr. Karapanos and Mr. Thomas continue to misappropriate the Products or products derived therefrom, by and through their own activities and/or Metron.

83.     Indeed, a second limited liability company was formed, with Dr. Karapanos listed as a member—Metron II's articles of organization were filed with the Ohio Secretary of State on or about October 9, 2014.

84.     Upon information and belief, Metron II was formed to produce the Products in Cleveland, Ohio and Metron and/or Metron II intend to market and sell the Products and related products, including to Jeunesse.

85.     On information and belief, Metron, and/or Metron II, and/or Dr. Karapanos, and/or Mr. Thomas have entered into a lease for a manufacturing facility in Cleveland, Ohio at which they plan to manufacture the Products, derivatives thereof and/or other related products.

86.     Upon information and belief, Metron and/or Metron II have signed an agreement with Jeunesse to sell the Products or other related products, thereby usurping LHS's business opportunities.

87.    In recent days, Mr. Thomas has used social media to advertise the Products and has used LHS's scientific information to promote the products as his own. Evidence of Mr. Thomas's social media advertising efforts are attached as Exhibit 7.

## COUNT I
### (All Defendants - Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

88.    LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

89.    As a result of Defendants' actions, there is a substantial and continuing justiciable controversy between LHS and the Defendants' regarding the ownership of the formulas to the Products and the ownership of the provisional patent applications that were filed for the Products.

90.    LHS seeks a declaratory judgment that it owns the formulas to the Products and any related products that it owns the patent applications filed by its former Chief Scientist/Medical Director and sales representative, in addition to any patents that may issue therefrom.

91.    LHS is the rightful owner of said inventions and improvements pursuant to the Patent Laws of the United States, 35 U.S.C. §§ 1 – 376, and Ohio law, including, the invention described and claimed in the patent applications.

92.    To the extent that any patents issue from the patent applications, LHS seeks a declaration that any and all of the Defendants assign all of their rights and interests in said patents to LHS.

93.     LHS requests a judicial determination and declaration of the respective rights and duties of the parties that LHS is the owner of the patent applications that the Defendants have filed.

94.     Such a determination is necessary and appropriate at this time to ensure that the parties can ascertain their respective rights and duties regarding the patent applications or any patent that issues therefrom.

## COUNT II
### (Dr. Karapanos and Mr. Thomas - Breach of Duty of Loyalty)

95.     LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

96.     Dr. Karapanos provided services and Mr. Thomas was an independent sales representative of LHS and each owed a duty of loyalty to LHS.

97.     On information and belief, Dr. Karapanos has misappropriated LHS's trade secrets, usurped LHS's business opportunities and otherwise unfairly competed with LHS by taking the formula for the Products, in addition to other property.

98.     As a direct and proximate cause of Dr. Karapanos's breach of his duty of loyalty, LHS has been damaged in an amount to be proven at trial.

99.     Because Dr. Karapanos' conduct was willful, wanton, malicious, outrageous, deliberate, and made with full knowledge of, and total disregard for, LHS's rights, punitive damages against Dr. Karapanos are justified.

## COUNT III
### (Mr. Thomas - Breach of Non- Disclosure Agreement)

100.     LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

101.    Mr. Thomas and LHS are parties to the Thomas NDA, a valid and enforceable contract.

102.    Pursuant to the Agreement, Mr. Thomas agreed that he would not disclose Confidential Information (as that term is defined in the Thomas NDA), that he would hold the Confidential Information in the strictest confidence and that he would not use Confidential Information to compete with LHS.

103.    Upon information and belief, Mr. Thomas is using LHS's trade secret information, the formula to the Products to, unfairly compete with LHS. These actions include forming new companies—Metron and Metron II—and executing an agreement with Jeunesse for the sale of the Products.

104.    These actions constitute a breach of the Thomas NDA and the breach has caused loss and harm to LHS's business and entitles LHS to recover monetary damages in an amount to be proven at trial.

## COUNT IV
### (Mr. Thomas - Breach of Sales Agreement)

105.    LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

106.    Mr. Thomas and LHS are parties to the Sales Agreement, a valid and enforceable contract.

107.    Pursuant to the Agreement, Mr. Thomas agreed that he would not disclose confidential information, that he would hold the confidential information in the strictest confidence and expressly agreed that he had no ownership interest in the LHS's confidential information.

108.    Upon information and belief, Mr. Thomas is using LHS's trade secret information, the formula to the Products, to unfairly compete with LHS. These actions include forming new companies—Metron and Metron II—and executing an agreement with Jeunesse for the sale of the Products.

109.    These actions constitute a breach of the Sales Agreement and the breach has caused loss and harm to LHS's business and entitles LHS to recover monetary damages in an amount to be proven at trial.

## COUNT V
## (Dr. Karapanos and Mr. Thomas - Breach of Ohio Uniform Trade Secrets Act)

110.    LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

111.    At all relevant times, LHS has maintained its confidential and proprietary information and "trade secrets," within the meaning of the Ohio Uniform Trade Secrets Act. O.R.C. §§ 1333.61 – 1333.69, including the formula for the Products.

112.    While performing contracted services as Chief Scientist and Medical Director of LHS, Dr. Karapanos had access to and knowledge of LHS's trade secrets and other confidential and proprietary information, including, the chemical formulas to the Products. Accordingly, Dr. Karapanos acquired this information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

113.    While an independent sales representative for LHS, Mr. Thomas had access to and knowledge of LHS's trade secrets, including, other confidential and proprietary information. Accordingly, Mr. Thomas acquired this information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

114.    Dr. Karapanos and Mr. Thomas, without authorization from LHS, have used and disclosed LHS's trade secrets and confidential and proprietary information by, *inter alia*, filing provisional patents with the Patent and Trademark Office and entering into a contract with Jeunesse.

115.    Dr. Karapanos and Mr. Thomas are attempting to commercially use LHS's trade secrets and other confidential and proprietary information, for their own benefit and without LHS's consent and to the exclusion of LHS's benefit.

116.    As a direct and proximate cause of Dr. Karapanos's and Mr. Thomas's actions, LHS has been damaged and will continued to be damaged in an amount to be determined at trial.

117.    Because Dr. Karapanos's and Mr. Thomas's conduct was willful, malicious, outrageous, wanton, deliberate, and made with full knowledge or, and total disregard for LHS's rights, punitive damages against Dr. Karapanos and Mr. Thomas are warranted.

## COUNT VI
### (All Defendants - Unfair Competition)

118.    LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

119.    The Defendants' actions, including, but not limited to, their misappropriation, use and disclosure of LHS's trade secrets constitute unfair competition.

120.    The Defendants' unfair competition has caused loss and harm to LHS's business, including, but not limited to, its business relationship with Jeunesse, and entitles it to recover monetary damages.

121.    The Defendants' unfair competition has caused and will continue to cause irreparable injury to LHS's business for which it has no adequate remedy at law, entitling it to injunctive relief.

## COUNT VII
## (All Defendants - Tortious Interference with Business Relationship)

122.    LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

123.    In connection with its operations, LHS is engaged in business relationships with various suppliers and third parties, including Jeunesse.

124.    LHS's relationship with Jeunesse included a recent trip to Florida to discuss a business agreement between the two companies.

125.    Dr. Karapanos and Mr. Thomas, respectively, as Chief Scientist/Medical Director and representative of LHS, and jointly and severally, had actual knowledge of LHS's business relationships generally and especially its relationship with Jeunesse because they attended the meeting with Jeunesse in their official capacities with LHS.

126.    Metron and Metron II have constructive knowledge of LHS's business relationships, including with Jeunesse, by and through their owners—Dr. Karapanos and Mr. Thomas.

127.    Defendants, acting without privilege or justification, have tortiously interfered with LHS's business relationships by, *inter alia*, filing provisional patents on LHS's products, entering into contracts with third parties, including Jeunesse, to sell LHS's products and by otherwise interfering with LHS's proposed contract with Jeunesse.

## COUNT VIII

**(All Defendants – Conversion)**

128.     LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

129.     Defendants maintain possession of certain property belonging to LHS, including, *inter alia*, an Apple Mac Book Pro, LHS's books and records, and the formulas to the Products.

130.     Defendants obtained LHS's property through actual theft and/or deception.

131.     To date, despite numerous demands, Defendants have refused to return LHS's property to LHS.

132.     Defendants' continued possession of the above-referenced property is unlawful and otherwise wrongful.

133.     Defendants' conduct constitutes conversion and misappropriation of LHS's property, which has directly and proximately damaged LHS in an amount to be proven at trial.

**COUNT IX**
**(All Defendants - Unjust Enrichment/Quantum Meruit)**

134.     LHS restates and re-avers each and every allegation in the proceeding paragraphs as if fully re-stated herein.

135.   Defendants have been unjustly enriched through their unlawful possession and use of LHS's property, including the Mac Book Pro, and through their usurpation of LHS's business relationship with Jeunesse.

136.   Defendants have been unjustly enriched through their unlawful misappropriation and use of Plaintiff's trade secrets, including, confidential and proprietary information, which they have used to unfairly compete against LHS.

137.   As a direct and proximate result of Defendants' conduct, LHS has been damaged in an amount to be proven at trial.

**WHEREFORE,** LHS prays for judgment as follows:

(A)   A temporary restraining order, preliminary and permanent injunction that:

    (i)   restrains Defendants from manufacturing, producing, or otherwise selling products containing modified or unmodified aluminosilicates or aluminosilicate derived salts, including, but not limited to those created from clinoptilolite or other zeolites;

    (ii)   declares that LHS is the rightful owner of the Products and any products derived therefrom, including, their formula and manufacturing processes;

    (iii)   requires Defendants to abandon their patent applications or, if one or more patents are issued on any such applications, assign any and all rights that they may have in such patents to LHS; and

    (iv)   requires Defendants to return any and all of LHS's property, including, any and all computers, books and other materials;

(B)   Compensatory damages in an amount to be determined at trial for Counts II through IX;

(C)   Attorney fees and costs against Defendants for their intentional, willful, wanton and malicious actions as set forth in this Verified Complaint; and

(D)   Such other relief as the Court deems just and proper.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ PLL**

*/s/ Brett Krantz*

BRETT KRANTZ (0069238)
MARY K. WHITMER (0018213)
JUSTINE LARA KONICKI (0086277)
One Cleveland Center, 20th Floor
1375 East Ninth Street
Cleveland, Ohio 44114-1793
Telephone: (216) 696-8700
Facsimile: (216) 621-6536
Email: bk@kjk.com; mkw@kjk.com;
jlk@kjk.com

*Counsel for Plaintiff*

STATE OF OHIO                          )
                                       )        SS: <u>VERIFICATION</u>
COUNTY OF CUYAHOGA                      )


    I, Bert Moyar, the Chairman of LifeHealth Science, LLC being first duly sworn, depose and state that I have reviewed the foregoing Complaint.  The allegations contained therein are true and accurate to the best of my knowledge and belief.


_____
Bert Moyar


**SWORN TO BEFORE ME AND SUBSCRIBED** in my presence this 27th

day of October, 2014.


_____
NOTARY PUBLIC


ALAN M. RAUSS
Attorney At Law
NOTARY PUBLIC
STATE OF OHIO
My Commission Has
No Expiration Date
Section 147.03 O.R.C.